FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

2010 NOV 18  AM 11: 54

LORETTA G. WHYTE
CLERK

**FELONY**

## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF LOUISIANA

### INDICTMENT FOR CONSPIRACY, WIRE FRAUD, FRAUD IN CONNECTION WITH IDENTIFICATION DOCUMENTS, HEALTH CARE FRAUD, WITNESS TAMPERING AND ASSET FORFEITURE

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | CRIMINAL NO. **10-328** |
| **v.** | * | SECTION: **SECT. L  MAG. 3** |
| **SEAN DANIEL ALFORTISH** | * | VIOLATIONS: |
| **MONA HEBERT ROMERO** | | **18 U.S.C. § 371** |
| | * | **18 U.S.C. § 1343** |
| | | **18 U.S.C. § 2** |
| | * | **18 U.S.C. § 1028(a)(7)** |
| | | **18 U.S.C. § 1028 (c)(3)(B)** |
| | * | **18 U.S.C. § 1028(b)(2)(B)** |
| | | **18 U.S.C. § 1347** |
| | * | **18 U.S.C. § 1512(b)(3)** |

\*        \*        \*

The Grand Jury charges that:

## COUNT 1

**A.    AT ALL TIMES MATERIAL HEREIN:**

1.    The defendant, **SEAN DANIEL ALFORTISH (ALFORTISH),** was a licensed

Louisiana attorney who operated a private legal practice and served as a magistrate judge.

___ Fee _USA_
___ Process _____
_x_ Dktd _____
___ CtRmDep _____
___ Doc. No. _____

## The HBPA

2.      The Louisiana Horsemen's Benevolent and Protective Association 1993, Inc. ("HBPA") was recognized by Louisiana law as the representative of horsemen racing at licensed races held in the State of Louisiana. A horseman was a race horse owner or trainer and was eligible for membership in the HBPA once his race horse started in one qualifying race in Louisiana. HBPA members were entitled to vote for officers and directors of the HBPA.

3.      The purposes of the HBPA included promoting the common business interests of its members, improving conditions in the horse racing industry of Louisiana, and advocating for state and federal legislation. The HBPA was exempt from federal taxes under Section 501(c)(6) of the Internal Revenue Code, and none of its income could inure to the benefit of its individual members.

4.      **ALFORTISH** owned thoroughbred horses and, from March 2005 to the present, served as the President of the HBPA. **ALFORTISH** was reelected to a second term as President of the HBPA after an election in which ballots were counted on March 31, 2008 ("the March 2008 election"). As President of the HBPA, **ALFORTISH** was unpaid. **ALFORTISH** was employed by the HBPA as the Director of Workers' Compensation and Director of Simulcasting.

5.      The defendant, **MONA HEBERT ROMERO (ROMERO),** was initially employed as a seasonal field office representative for the HBPA. In April 2005, shortly after **ALFORTISH** was elected to his first term as HBPA President, **ROMERO** became employed as the Executive Director of the HBPA and was authorized to sign checks drawn on various HBPA checking accounts.

2

6.    **ROMERO** and Persons A and B, other employees of the HBPA and/or The Louisiana Horsemen's Medical Benefits Trust, were related to each other through marriage.

7.    Person C was an employee of the HBPA assigned to the workers' compensation insurance program.

### The Medical Benefits Trust

8.    The Louisiana legislature passed several laws dictating that monies from specified horse-racing activities be paid to the HBPA for the hospital and medical benefits of identified beneficiaries. The law also dictated that no more than 30% of these funds could be used for administrative expenses and other costs necessary to provide the benefits.

9.    On November 30, 1993, the Louisiana Horsemen's Medical Benefit Plan (Medical Benefits Trust) was created to provide hospital and medical benefits and to pay for the administrative expenses related to providing such benefits to eligible beneficiaries.

10.    A trust agreement provided that the Medical Benefits Trust was funded exclusively from statutorily dedicated funds which were to be used to provide hospital and medical benefits in such form and manner to such individuals specified in the plan.

11.    The trust agreement also provided that no part of the Trust funds shall be diverted to the benefit of the HBPA or any HBPA member other than through the payment of benefits.

12.    The trust agreement further provided that the assets were transferred to the Medical Benefits Trust subject to statutory restrictions on their use, that is, that they could only be used to provide hospital and medical benefits and pay related administrative expenses for eligible Louisiana horsemen.

13.    As a public or private plan or contract that affects commerce under which a medical benefit, item or service was provided to any individual, the Horsemen's Medical Benefit Plan was a health care benefit program as defined in Title 18, United States Code, Section 24(b).

14.    **ALFORTISH** became a trustee of the Medical Benefits Trust in April, 2005. **ROMERO** was authorized to sign checks drawn on the Medical Benefit Trust administrative bank account.

## B.    THE CONSPIRACY:

Beginning at a time unknown but prior to on or about January 1, 2008, and continuing until the date of the return of this indictment, in the Eastern District of Louisiana and elsewhere, the defendants **SEAN DANIEL ALFORTISH** and **MONA HEBERT ROMERO** and others known and unknown to the Grand Jury, willfully and knowingly did combine, conspire, confederate and agree together and with each other to commit the following offenses against the United States and to conceal their commission, namely:

1.    To devise and intend to devise a scheme and artifice to defraud and to obtain money and property by means of false and fraudulent pretenses, representations and promises, and for the purposes of executing and attempting to execute such scheme and artifice to defraud, placing and causing to be placed in any post office and authorized depository for mail matter any matter or thing whatever to be sent and delivered by the Postal Service and knowingly causing to be delivered by mail according to the direction thereon and at the place at which it was directed to be delivered to the person to whom it is addressed, any such matter or thing in violation of Title 18, United States Code, Section 1341;

2.      To devise and intend to devise a scheme and artifice to defraud, and to obtain money and property by means of false and fraudulent pretenses, representations and promises, by transmitting and causing to be transmitted by means of wire, radio and television communication in interstate commerce, any writings, signs, signals, pictures and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343;

3.      To knowingly transfer, possess and use, without lawful authority, a means of identification of another person, namely, a Social Security number, with the intent to commit, and in connection with, any unlawful activity that constitutes a violation of Federal law, to wit, conspiracy in violation of Title 18, United States Code, Section 371, to commit mail fraud in violation of Title 18, United States Code, Section 1341, and wire fraud in violation of Title 18, United States Code, Section 1343; and the means of identification was transported in the mail in the course of such use prohibited by law, in violation of Title 18, United States Code, Section 1028(a)(7); Section 1028 (c)(3)(B), and Section 1028(b)(2)(B); and

4.      To knowingly and willfully execute and attempt to execute a scheme and artifice to defraud the Louisiana Horsemen's Medical Benefit Plan and to obtain, by means of false and fraudulent pretenses, representations, and promises, money owned by and under the custody and control of the Louisiana Horsemen's Medical Benefit Plan in connection with the delivery or any payment for health care benefits and services, in violation of Title 18, United States Code, Section 1347.

C.      **OBJECT OF THE CONSPIRACY**

The principal objective of the defendants, **ALFORTISH** and **ROMERO,** and others known and unknown to the Grand Jury, who had willfully and knowingly devised and intended

to devise a scheme and artifice to defraud, was to obtain money and property by means of false pretenses, representations and promises, from the Horsemen's Benevolent and Protective Association 1993, Inc., its members, officers, directors, employees and candidates for office in the March 2008 election, as well as from the Louisiana Horsemen's Medical Benefit Trust and the beneficiaries of that trust, namely, by taking and accepting salary, fringe benefits, financial and other rewards as officers and employees of the HBPA.

It was a further objective of the defendants, **ALFORTISH** and **ROMERO**, to ensure that **ALFORTISH** was re-elected to a second term of office as president of the HBPA and to elect new board members to replace certain members of the board of directors because they questioned **ALFORTISH** and **ROMERO** about the finances of the HBPA during **ALFORTISH's** first term of office.  **ALFORTISH** and **ROMERO** identified individuals whom they encouraged to run for the board of director positions and created favorable biographies for publication to HBPA members with the expectation that these new board members would not question their operation of the HBPA as certain members of the previous board of directors had.

**ROMERO** and others identified HBPA members who were eligible to vote in the March 2008 election but who were unlikely to actually vote, by determining which members had obtained workers compensation insurance coverage for a single race during the time period considered in determining eligibility to vote.  Many such members lived outside Louisiana.  In order for a ballot to be counted as valid in the March 2008 election, the completed ballot had to be delivered by the United States Postal Service to the firm authorized to count ballots and the ballot enclosure envelope had to bear the Social Security number of an HBPA member eligible to vote in the election.

6

**ALFORTISH**, **ROMERO** and others known and unknown to the Grand Jury retained control of the HBPA after the March 2008 election by traveling and causing others to travel to various locations in the United States to mail ballots they had falsified or caused to be falsified. Those ballots contained votes for the individuals that **ALFORTISH** and **ROMERO** selected to run for the Board of Directors and for **ALFORTISH** for President.  By rigging the election, **ALFORTISH** and **ROMERO** could continue to benefit from the operation of the HBPA and to receive salaries, fringe benefits, financial and other rewards from the HBPA, the Medical Benefit Trust and related entities.

Under the administration of **ALFORTISH** and **ROMERO**, the expenses of the HBPA exceeded its income, and it also was an object of the conspiracy that **ALFORTISH** and **ROMERO** routinely siphoned the money of the Medical Benefit Trust for the use of the HBPA, as well as to benefit themselves personally, even though the defendants knew that the Louisiana legislature and the trust agreement governing those funds required that the funds be used solely to pay for hospital and medical benefits and to pay for administrative expenses related to providing those benefits.

**ALFORTISH** and **ROMERO** also knowingly used intimidation, threats, corrupt persuasion, and misleading conduct toward witnesses in attempts to hinder, delay and prevent those witnesses from communicating with law enforcement concerning the defendants' criminal offenses.

**D.    WAYS AND MEANS TO ACCOMPLISH THE CONSPIRACY:**

Among the ways and means by which **ALFORTISH** and **ROMERO** carried out the

conspiracy:

    1.    During his first term of office, from March 2005 until March 31, 2008,

**ALFORTISH** received the following benefits from the HBPA and related entities:

        a.    a total of $116,000 in salary as Director of Workers' Compensation and Director of Simulcasting, while **ALFORTISH** continued to practice law and to serve as a magistrate judge;

        b.    fully paid health insurance for himself and his family with premiums totaling $1,232 per month;

        c.    use of HBPA credit cards for travel, entertainment, and gasoline for his personal vehicle, a HUMMER, paid out of the Medical Benefits Trust;

        d.    OnStar navigation service and satellite radio service in his personal vehicle;

        e.    travel to Aruba and Grand Caymans;

        f.    a Bose surround sound system purchased and installed in his home at a cost of $2,824; and

        g.    reimbursement of $25,000 he paid to settle a threatened sexual harassment claim by an employee of the HBPA against him personally.

    2.    From in or about March 2005, until March 31, 2008, **ROMERO** received the

following benefits:

        a.    a total of $228,275 in salary paid out of the Medical Benefits Trust administrative account;

        b.    fully paid health insurance for herself and her family with premiums totaling $1,330 per month;

        c.    a 2007 GMC Acadia sports utility vehicle leased for her use, plus gasoline and OnStar navigation and satellite radio service;

     d.     use of the HBPA credit cards for travel and entertainment with expenditures paid out of the Medical Benefit Trust;

     e.     travel for herself and her husband to Aruba and the Grand Caymans;

     f.     a genuine Louis Vuitton handbag purchased for her;

     g.     a payment of $2,500 from the Charitable Foundation; and

     h.     the benefit of a $25,000 payment made to a claimant to dismiss a claim of sexual harassment against her personally.

## E.    OVERT ACTS:

On or about the following dates, in furtherance of and to conceal the conspiracy and accomplish its purposes, the defendants, **SEAN DANIEL ALFORTISH** and **MONA ROMERO** and others, committed the following overt acts, among others, in the Eastern District of Louisiana and elsewhere:

1.    On March 13, 2008, **ROMERO** and Person B obtained leftover ballots for the March 2008 election from the printer. The ballots, ballot enclosure envelopes and return envelopes remained at the printer's after most election materials had been mailed by the printer directly to HBPA members eligible to vote.

2.    On March 13, 2008, **ROMERO** and Person C, traveled to L'Auberge du Lac, a casino resort and spa located in Lake Charles, Louisiana, to falsify election ballots and ballot enclosure envelopes for the March 2008 election.

3.    On March 14, 2008, **ALFORTISH, ROMERO** and Person C had a series of conversations about **ROMERO** and Person C meeting to falsify election ballots.

4.    On March 15, 2008, **ROMERO** traveled to Person C's residence in Breaux Bridge, Louisiana, where they both falsified election ballots and ballot enclosure envelopes by using Social Security numbers of HBPA members without those members' knowledge.

5.    On or about March 19, 2008, **ROMERO** caused airline reservations to be made and airline tickets to be purchased in the names of **ROMERO** and Persons A and B.

6.    On March 20, 2008, **ROMERO** gave Person A an airline ticket in Person A's name for a round trip flight between New Orleans and Houston on March 21, 2008, as well as an airline ticket for a round trip flight between New Orleans and Tampa on March 22, 2008.

7.    On March 20, 2008, **ROMERO** gave Person A two bags in which envelopes were contained.

8.    On March 20, 2008, **ROMERO** instructed Person A to fly to Houston, Texas the following day, March 21, 2008, and to fly to Tampa, Florida the day after that, March 22, 2008 and in each city, to mail the envelopes she had given to Person A.

9.    On March 20, 2008, **ROMERO** in the presence of Person A, called **ALFORTISH** and had a conversation about mailing envelopes containing falsified ballots.

10.   On March 21, 2008, Person B, using the airline ticket which **ROMERO** caused to be purchased in her name, flew from New Orleans, Louisiana, to Cincinnati, Ohio, to Louisville, Kentucky, to Atlanta, Georgia; and back to New Orleans, Louisiana, all on the same day.

11.   On March 21, 2008, Person A, using the airline ticket which **ROMERO** caused to be purchased in her name, flew from New Orleans, Louisiana, to Houston, Texas, and back to New Orleans, Louisiana, all on the same day.

12.   On March 21, 2008, Person A, while in Houston, Texas, and nearby areas, mailed envelopes containing falsified election ballots and ballot enclosure envelopes bearing the Social Security numbers of other persons used without lawful authority.

13.   On March 22, 2008, **ROMERO** flew from New Orleans, Louisiana, to Dallas, Texas, and back to New Orleans, Louisiana, all on the same day.

14.   On March 22, 2008, **ROMERO** rented an automobile to use in Dallas, Texas.

15.   On March 22, 2008, Person A, using an airline ticket which **ROMERO** caused to be purchased in her name, flew from New Orleans, Louisiana, to Tampa, Florida, and back to New Orleans, Louisiana, all on the same day.

16.   On March 22, 2008, Person A rented an automobile to use in Tampa, Florida.

17.     On March 22, 2008, Person A while in Tampa, Florida and nearby areas, mailed envelopes containing falsified election ballots and ballot enclosure envelopes bearing the Social Security numbers of other persons used without lawful authority.

18.     On June 11, 2008, **ALFORTISH** told Person C not to speak with law enforcement agents conducting an investigation into the March 2008 election.

19.     On or about November 3, 2010, **ROMERO** urged Person A to "stick together" with her, **ALFORTISH** and others, and not to cooperate with the law enforcement authorities investigating their conduct.

20.     On November 3, 2010, **ALFORTISH**, gave a legal opinion to Person A, whom **ALFORTISH** knew to be represented by another attorney.  Person A's lawyer gave no consent to **ALFORTISH** to have the communication with his client, Person A.  Further, **ALFORTISH's** communication with Person A was in **ALFORTISH's** own personal interest and not necessarily in the best interest of Person A.

All in violation of Title 18, United States Code, Section 371.

## COUNTS  2 - 5

**A.**     **AT ALL TIMES MATERIAL HEREIN**:

The allegations contained in Section A of Count 1 are realleged and incorporated by reference as though fully set forth herein.

**B.**     **THE SCHEME TO DEFRAUD**

Beginning at a time unknown but prior to on or about January 1, 2008, and continuing until the date of the return of this indictment, in the Eastern District of Louisiana and elsewhere, the defendants, **SEAN DANIEL ALFORTISH** and **MONA ROMERO** and others known and unknown to the Grand Jury, did unlawfully, willfully and knowingly devise and intend to devise a scheme and artifice to defraud and to obtain money and property by means of false pretenses, representations and promises, from the Horsemen's Benevolent and Protective Association 1993,

Inc., its members, officers, directors, employees and candidates for office in the March 2008

election, as well as from the Louisiana Horsemen's Medical Benefit Trust and the beneficiaries

of that trust, namely, by taking and accepting salary, fringe benefits, financial and other rewards

as officers and employees of the HBPA.  It was part of the scheme and artifice to defraud that

certain election ballots and ballot enclosure envelopes for the March 2008 election were falsified

and caused to be falsified by the defendants and that the ballots were mailed and caused to be

mailed by **ALFORTISH** and **ROMERO** and others known and unknown to the Grand Jury.

**C.**    **THE USE OF THE WIRES:**

On or about March 21, 2010, in the Eastern District of Louisiana and elsewhere, the

defendants **ALFORTISH** and **ROMERO** for the purpose of executing and attempting to

execute the aforesaid scheme and artifice to defraud and to obtain money and property, did

knowingly and willfully transmit and cause to be transmitted between the below-listed

destinations, by means of wire communication in interstate commerce, certain signs, signals and

sounds in the form of electronically transmitted debits from the bank account of **ROMERO**, in

payment of airline tickets for travel to the following destinations by the following individuals:

| Ct. | Wire From and To | Date of Wire | Date of Travel | Traveler | Destinations |
|---|---|---|---|---|---|
| 2 | Cincinnati Ohio Houston Texas | 3/21/2008 | 3/22/2008 | **MONA ROMERO** | Dallas, New Orleans |
| 3 | Cincinnati Ohio Houston Texas | 3/21/2008 | 3/21/2008 | Person A | Houston, New Orleans |
| 4 | Cincinnati Ohio Atlanta Georgia | 3/21/2008 | 3/21/2008 | Person B | Cincinnati, Louisville, Atlanta, New Orleans |
| 5 | Cincinnati Ohio Houston Texas | 3/21/2008 | 3/22/2008 | Person A | Tampa, New Orleans |

All in violation of Title 18, United States Code, Sections 1343 and 2.

12

## COUNTS 6 THROUGH 18

From a time unknown to the Grand Jury but not later than March 13, 2010, until on or about June 15, 2010, in the Eastern District of Louisiana and elsewhere, the defendants, **SEAN DANIEL ALFORTISH** and **MONA ROMERO** and others known and unknown to the Grand Jury, did knowingly transfer, possess and use, and cause to be transferred, possessed and used, without lawful authority, a means of identification of another person, that is, Social Security numbers, with the intent to commit, and to aid and abet, and in connection with, any unlawful activity that constitutes a violation of Federal law; that is, conspiracy in violation of Title 18, United States Code, Section 371, to commit mail fraud in violation of Title 18, United States Code, Section 1341, and to commit wire fraud in violation of Title 18, United States Code, Section 1343; and the said means of identification were transported in the mail in the course of such transfer, possession and use as set forth below by transferring, possessing and using falsified election ballots and ballot envelopes bearing the Social Security numbers of the following individuals:

| COUNT | NAME CODE | SOCIAL SECURITY CODE |
|-------|-----------|----------------------|
| 6 | Im** Bi*** | *** ** 4835 |
| 7 | Ma***** Cl*** | *** ** 5273 |
| 8 | Da*** Co*** | *** ** 7586 |
| 9 | Li*** Ha**** | *** ** 6557 |
| 10 | Ca*** He*** | *** ** 6610 |
| 11 | Br**** Hu**** | *** ** 0463 |
| 12 | St***** Ol**** | *** ** 0548 |
| 13 | Jo** Pu*** | *** ** 9526 |

| COUNT | NAME CODE | SOCIAL SECURITY CODE |
|-------|-----------|----------------------|
| 14 | Bi*** Ra*** | *** ** 4066 |
| 15 | Wa*** Sa***** | *** ** 1541 |
| 16 | Jo** Si**** | *** ** 4992 |
| 17 | El******* Sq***** | *** ** 1523 |
| 18 | Di*** Ti**** | *** ** 4297 |

All in violation of Title 18, United States Code, Sections 1028(a)(7); 1028 (c)(3)(B); 1028(b)(2)(B), and 2.

## COUNT 19

### The Charitable Foundation

**A.    AT ALL TIMES MATERIAL HEREIN:**

1.    The allegations contained in Section A of Count 1 are realleged and incorporated by reference as though fully set forth herein.

2.    On October 28, 2005, the Louisiana Horsemen's Benevolent and Protective Association Charitable Foundation, Inc. (Charitable Foundation) was established to receive and distribute funds donated by individuals and organizations to the HBPA after Hurricanes Katrina and Rita.  As a charitable organization, the Charitable Foundation was granted exemption from federal taxes under applicable regulations of the Internal Revenue Service.  The Charitable Foundation provided assistance to people associated with horse-related businesses who were in need of temporary and long term shelter and basic necessities because of a natural disaster.  From in or about September 2005 through in or about August 2006, the HBPA and the Charitable Foundation received at least $788,507 donated for hurricane relief.

3.    **ALFORTISH** was president of the Charitable Foundation.

4.       **ROMERO** was authorized to sign checks drawn on the bank accounts of the Charitable Foundation.

**B.       THE SCHEME TO DEFRAUD**

Beginning in or about September 2005 and continuing until, in or about August 2009, in the Eastern District of Louisiana and elsewhere, the defendants **SEAN DANIEL ALFORTISH** and **MONA HEBERT ROMERO** did unlawfully, willfully and knowingly devise and intend to devise a scheme and artifice to defraud and to obtain money and property by means of false pretenses, representations and promises from the National Horsemen's Benevolent and Protective Association and other organizations and individuals who donated funds for hurricane relief to the HBPA and the Charitable Foundation.

It was a part of the scheme and artifice to defraud that **ALFORTISH** and **ROMERO** had access to at least $788,507 in funds of the Charitable Foundation to dispense at their discretion without oversight.

It was a further part of the scheme and artifice to defraud that, contrary to representations made to officials of the National Horsemen's Benevolent and Protective Association that the funds donated would be properly distributed after review by a screening committee composed of specific persons, **ALFORTISH** and **ROMERO** distributed the funds in their sole discretion without review and approval by the screening committee.

It was a further part of the scheme and artifice to defraud that certain funds were not paid only to provide assistance to people associated with horse-related businesses in need of temporary and long term shelter and basic necessities because of a natural disaster. Instead the Charitable Foundation paid $2,500 to **ROMERO** although she had not suffered damages because

15

of a natural disaster, $2,824 to purchase and install a Bose surround sound system in **ALFORTISH's** home, $7,000 for a college scholarship, and $2,500 for a bonus to an HBPA employee who had requested a pay raise.

It was a further part of the scheme and artifice to defraud that the funds were not paid in accordance with Internal Revenue Service guidelines for the operation of a charitable organization exempt from federal taxes under Section 501(c)(3) of the Internal Revenue Code.

It was a further part of the scheme and artifice to defraud that after most of the funds had been paid out allegedly for relief purposes, that the Charitable Foundation remained in existence to receive funds in the event another natural disaster occurred and/or a further distribution of relief funds became necessary.

It was a further part of the scheme and artifice to defraud that in August 2009, **ROMERO** lied to a member of the board of directors of the Charitable Foundation concerning a payment made by the Charitable Foundation for a college scholarship.

## C.    THE USE OF THE WIRES:

In or about January 2008, in the Eastern District of Louisiana, the defendants **SEAN ALFORTISH** and **MONA HEBERT ROMERO,** for the purpose of executing and attempting to execute the aforesaid scheme and artifice to defraud and to obtain money and property, did knowingly and willfully transmit and cause to be transmitted between New Orleans, Louisiana, and Lexington, Kentucky, by means of wire communications in interstate commerce, certain signs, signals and sounds in the form of electronically transmitted email containing a document entitled "Urgent Message from President Alfortish HBPA."

All in violation of Title 18, United States Code, Sections 1343 and 2.

16

## COUNTS 20 THROUGH 28

### Health Care Fraud

**A.    AT ALL TIMES MATERIAL HEREIN:**

The allegations contained in Section A of Count 1 are realleged and incorporated by reference as though fully set forth herein.

**B.    THE OBJECT OF THE SCHEME:**

From about in or about March 2005, until in or about November 2010, **ALFORTISH** and **ROMERO** routinely caused up to 30% of the statutorily dedicated funds received by the HBPA under the Louisiana law to be deposited into a bank account designated as the administrative account for the Medical Benefit Trust. **ALFORTISH** and **ROMERO** used funds from the administrative account for expenses that were not administrative expenses and other costs necessary to provide medical and hospital benefits for eligible owners and trainers and their employees. Under Louisiana law and the terms of the Medical Benefit Trust Agreement, such expenses were not allowed to be paid out of the Trust, and the trustees of the Medical Benefit Trust had not approved or ratified such uses. The object of the scheme was to enrich **ALFORTISH** and **ROMERO** personally through the payment of salary, fringe benefits and other financial rewards, as well as to create the impression that the HBPA was in excellent financial condition, and that its programs were well-managed under their administration, so that the defendants could continue in their various positions with the HBPA and related entities.

**C.    HEALTH CARE FRAUD**

Beginning in or about March 2005, and continuing until November 2010, in the Eastern District of Louisiana and elsewhere, the defendants, **SEAN DANIEL ALFORTISH** and

**MONA HEBERT ROMERO,** did knowingly and willfully devise and attempt to devise a scheme and artifice to defraud the Louisiana Horsemen's Medical Benefit Trust, and to obtain, by means of false and fraudulent pretenses, representations, and promises, money owned by, and under the custody and control of the Louisiana Horsemen's Medical Benefit Trust, in connection with the delivery of, and payment for, health care benefits and services.

It was part of the scheme to defraud that **ALFORTISH** and **ROMERO** siphoned funds from the Medical Benefits Trust administrative account by advancing payments for the HBPA for expenses other than medical and hospital benefits and related administrative expenses, which resulted in the HBPA owing the Medical Benefits Trust approximately $823,285 as of June 30, 2010, which the HBPA would not pay back. Because of the lack of funds, the Medical Benefits Trust delayed claims payments to beneficiaries and health care providers, and reduced medical and hospital benefits, for example, by excluding coverage for care to children, coverage which previously had been provided under the Medical Benefits Trust.

It was a further part of the scheme to defraud that **ALFORTISH** and **ROMERO** siphoned funds from the Medical Benefits Trust by allocating to it percentages of certain allegedly shared administrative expenses, although the expenses were not genuine administrative expenses or other costs necessary to provide medical and hospital benefits to eligible Louisiana horsemen, or the percentages used to allocate the shared expenses had no valid support, and had not been reviewed and authorized by the trustees of the Medical Benefits Trust.

It was a further part of the scheme to defraud that where genuine administrative expenses necessary to provide hospital and medical benefits could be paid for less than 30% of the statutorily dedicated funds allowed by law to be used for administrative expenses, **ALFORTISH**

and **ROMERO** diverted the surplus to pay personal expenses or general expenses of the HBPA instead of using those funds as required by law for medical and hospital benefits and related administrative expenses; for example, by establishing or increasing reserves to pay administrative costs and benefits in future years, by expanding the coverage of the Medical Benefit Trust, or by providing increased benefits to those whose coverage had been exhausted.

It was a further part of the scheme and artifice to defraud that expenses incurred in the course of falsifying ballots in the March 2008 election of the HBPA, including the costs of food and beverages, spa treatments and "no show" and late cancellation fees for spa treatments for **ROMERO** and Person C, were paid out of the Medical Benefits Trust administrative account.

It was a further part of the scheme and artifice to defraud that the following costs, which were not associated with providing medical or hospitalization benefits or related administrative expenses, were paid out of the Medical Benefits Trust administrative account under the guise of administrative costs:

1. costs to have a private investigator follow and report on the activities of an employee of the workers compensation insurance program;

2. costs of personal attire, including evening gowns, shoes, handbags, and diamond cufflinks;

3. costs to attend the inauguration in Baton Rouge, Louisiana, of a public official and a fundraiser for that public official held in the State of California;

4. costs for **ALFORTISH** and **ROMERO** and others to travel internationally to the Cayman Islands;

5. fees of political consultants and costs to entertain politicians, lobbyists, and public officials;

6. bonuses paid to **ROMERO** and Person C for raising money for a political candidate;

7.    a $10,000 loan to the Horsemen's Alliance, a political action committee, so that committee could pay campaign contributions to politicians; and

8.    costs of parties, celebrations and conventions.

**D.    EXECUTIONS:**

On or about the dates listed below, in order to execute and attempt to execute the above-described scheme and artifice to defraud, the defendants, **SEAN DANIEL ALFORTISH** and **MONA HEBERT ROMERO,** did cause the following payments to be made out of the Louisiana Horsemen's Medical Benefit Trust administrative account as indicated below:

| CT. | DATE OF PAYMENT | PAYABLE TO | AMOUNT |
|---|---|---|---|
| 20 | 4/27/2006 | H**** B***** | $2,916.00 |
| 21 | 6/14/2006 | American Expressweb Remit | $32,751.05 |
| 22 | 12/19/2007 | American Express | $11,764.18 |
| 23 | 1/8/2008 | Visa Chase Cardmember Service | $4,868.94 |
| 24 | 2/21/2008 | American Express | $25,702.08 |
| 25 | 4/22/2008 | American Express | $8,421.63 |
| 26 | 3/20/2009 | American Express | $7,528.57 |
| 27 | 4/22/2009 | Horsemen's Alliance | $10,000.00 |
| 28 | 7/9/2009 | Baker Street Research | $4,820.94 |

All in violation of Title 18, United States Code, Sections 1347 and 2.

## COUNT 29

### Witness Tampering

From a time unknown to the Grand Jury but not later than May 1, 2010, until on or about November 3, 2010, in the Eastern District of Louisiana, defendants **SEAN DANIEL ALFORTISH** and **MONA HEBERT ROMERO**, did knowingly attempt to and did intimidate, threaten, corruptly persuade and engage in misleading conduct toward Person A, an employee of the Horsemen's Benevolent and Protective Association 1993, Inc., and the Louisiana Horsemen's Medical Benefit Trust, all with the intent to hinder, delay and prevent the communication by Person A to a law enforcement officer of the United States of information relating to the commission of a Federal offense;

All in violation of Title 18, United States Code, Sections 1512(b)(3) and 2.

### NOTICE OF HEALTH CARE FRAUD FORFEITURE

1.      The allegations contained in Counts 1 and 20 through 28 of this Indictment are hereby re-alleged and incorporated by reference for the purpose of alleging forfeitures to the United States pursuant to the provisions of Title 18, United States Code, Section 982(a)(7).

2.      As a result of the offenses alleged in Counts 1 and 20 through 28, defendants, **SEAN DANIEL ALFORTISH** and **MONA HEBERT ROMERO**, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(7), any and all property, real and personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offenses and all property traceable to such property as a result of the violations of Title 18, United States Code, Sections 371 and 1347, which is a Federal Health Care offense within the meaning of Title 18, United States Code, Section 24.

21

3.     If any of the property subject to forfeiture pursuant to Paragraph 2 of this Notice of Forfeiture, as a result of any act or omission of the defendants:

     a.     cannot be located upon the exercise of due diligence;

     b.     has been transferred, sold to, or deposited with, a third person;

     c.     has been placed beyond the jurisdiction of the Court;

     d.     has been substantially diminished in value; or

     e.     has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 18, United States Code, Section 982(b) to seek forfeiture of any other property of said defendants up to the value of the above forfeitable property;

All in violation of Title 18, United States Code, Section 982(a).

## NOTICE OF IDENTITY FRAUD FORFEITURE

1.     The allegations of Counts 1 and 6 through 18 of this Indictment are re-alleged and incorporated by reference as though set forth fully herein for the purpose of alleging forfeiture to the United States of America pursuant to the provisions of Title 18, United States Code, 982(a)(2)(B).

2.     As a result of the offenses alleged in Counts 1 and 6 through 18, the defendants, **SEAN DANIEL ALFORTISH** and **MONA HEBERT ROMERO,** shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(2)(B), all property real or personal, constituting, or derived from, proceeds the defendant obtained directly or indirectly, as a result of violations of Title 18, United States Code, Sections 371 and 1028.

22

3.    If any of the property subject to forfeiture pursuant to Paragraph 2 of this Notice of Forfeiture, as a result of any act or omission of the defendants:

    a.    cannot be located upon the exercise of due diligence;

    b.    has been transferred or sold to, or deposited with, a third person;

    c.    has been placed beyond the jurisdiction of the Court;

    d.    has been substantially diminished in value; or

    e.    has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 18, United States Code, Section 982(b)(1) and Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of said defendant(s) up to the value of the above forfeitable property.

All in violation of Title 18, United States Code, Section 982(a).

## NOTICE OF WIRE FRAUD, CONSPIRACY, AND WITNESS TAMPERING FORFEITURE

1.    The allegations of Counts 1, 2-5, 19 and 29 of this Indictment are re-alleged and incorporated by reference as though set forth fully herein for the purpose of alleging forfeiture to the United States of America pursuant to the provisions of Title 18,  United States Code, Section  981(a)(1)(C), made applicable through Title 28, United States Code, Section 2461.

2.    As a result of the offenses alleged in Counts 1, 2-5, 19, and 29, defendants, **SEAN DANIEL ALFORTISH** and **MONA HEBERT ROMERO** shall forfeit to the United

States pursuant to Title 18, United States Code, Section 981(a)(1)(C), made applicable through Title 28, United States Code, Section 2461, any and all property, real or personal, which constitutes or is derived from proceeds traceable to violations of Title 18, United States Code, Sections 371, 1341,1343, and 1512.

      3.     If any of the property subject to forfeiture pursuant to Paragraph 2 of this Notice of Forfeiture, as a result of any act or omission of the defendants:

      a.     cannot be located upon the exercise of due diligence;

      b.     has been transferred or sold to, or deposited with, a third person;

      c.     has been placed beyond the jurisdiction of the Court;

      d.     has been substantially diminished in value; or

      e.     has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of said defendant(s) up to the value of the above forfeitable property.

All in violation of Title 18, United States Code, Section 981(a)(1)(C), made applicable through Title 28, United States Code, Section 2461.

A TRUE BILL:

_____
FOREPERSON

_____
JIM LETTEN, #8517
UNITED STATES ATTORNEY

_____
JAN MASELLI MANN, #9020
First Assistant United States Attorney
Chief, Criminal Division

_____
EILEEN GLEASON, #980511 (D.C.)
Assistant United States Attorney

_____
G. DALL KAMMER, #26948
Assistant United States Attorney

_____
PATRICE HARRIS SULLIVAN, #14987
Assistant United States Attorney

New Orleans, Louisiana
November 18, 2010

25

FORM OBD-34
APR. 91

No._____

UNITED STATES DISTRICT COURT

Eastern    District of    Louisiana
_____ Criminal _____ Division

# THE UNITED STATES OF AMERICA

vs.

**SEAN DANIEL ALFORTISH**
**MONA HEBERT ROMERO**

## INDICTMENT

INDICTMENT FOR CONSPIRACY, WIRE FRAUD, FRAUD IN
CONNECTION WITH IDENTIFICATION DOCUMENTS, HEALTH CARE
FRAUD, WITNESS TAMPERING AND ASSET FORFEITURE

**VIOLATIONS:**

| | |
|---|---|
| 18 U.S.C. § 371; | 18 U.S.C. § 1343; |
| 18 U.S.C. § 1028(a)(7); | 18 U.S.C. § 1028(c)(3)(B); |
| 18 U.S.C. § 1028(b)(2)(B); | 18 U.S.C. § 1347; |
| 18 U.S.C. § 1512(b)(3) | 18 U.S.C. § 2 |

A true bill.

_____
Foreman

Filed in open court this _____ day, of _____
_____ A.D. 2010.

_____
Clerk

Bail, $_____

_____

**EILEEN GLEASON, Assistant U. S. Attorney**