UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | **CRIMINAL NO. 10-328** |
| **VERSUS** | * | |
| **SEAN ALFORTISH, ET AL.** | * | **SECTION "L"** |


### ORDER & REASONS

The Court has pending before it Defendants Sean Alfortish and Mona Romero's motion to dismiss the indictment. (Rec. Doc. 35). The Court has reviewed the briefs and heard oral argument and now issues this Order and Reasons.

**I.     Background**

On November 18, 2010, the United States Government filed a twenty-nine-count indictment charging Defendants Sean Alfortish and Mona Romero with conspiracy to commit mail fraud, wire fraud, health care fraud, and identification document fraud, as well as substantive counts of wire fraud, identification document fraud, health care fraud, and witness tampering. Alfortish was President and a Board Member of the Louisiana Horsemen's Benevolent and Protective Association 1993, Inc., ("HBPA"), the non-profit corporation recognized by Louisiana as the representative of horsemen and horse owners in the state. His position as President was unpaid, but Alfortish received a salary for his employment by the HBPA as Director of Workers' Compensation and Director of Simulcasting. Romero was not an elected board member; rather, she was employed as Executive Director of the HBPA, a paid

position.

The Indictment alleges misconduct by Alfortish and Romero falling into four general categories.  First, Defendants are alleged to have forged ballots to rig the 2008 election of the HBPA Board of Directors to ensure that Alfortish and a compliant Board would be re-elected so that Defendants could continue to personally benefit from their positions in the HBPA.  Second, Defendants are alleged to have defrauded a Medical Benefits Trust created for the benefit of Louisiana horse owners and racers.  Third, Defendants are alleged to have tampered with a witness.  Fourth, Defendants are alleged to have committed wire fraud in connection with misuse of Hurricane Katrina charitable relief donations.  Defendants are also charged with one count of conspiracy arising out of the first three areas of conduct, but not the charitable foundation wire fraud.

Specifically, Counts 2-5 charge both Defendants with wire fraud arising out of airline flights to different locations around the country from which Defendants mailed the fraudulent ballots in the 2008 Board election.  Counts 6-18 charge both Defendants with fraudulently using the social security numbers of HBPA members on the phony ballots, in violation of a federal identification fraud statute.  Count 19 charges both Defendants with wire fraud arising out of their alleged misuse of funds controlled by a charitable organization, which were donated after Hurricane Katrina to assist people in the horse racing business with shelter and necessities. Counts 20-28 charge both Defendants with health care fraud arising out of their misappropriation of statutorily-dedicated administrative funds of the Louisiana Horsemen's Medical Benefit Plan. Count 29 charges the Defendants with witness tampering arising out of their alleged attempt to intimidate an employee of the HBPA to prevent that person from communicating with an officer of the United States.

## II. Law & Analysis

Defendants Alfortish and Romero now move to dismiss the indictment in its entirety. They argue that, for various reasons, all of the counts in the Indictment fail to allege criminal conduct or fail to allege an essential element of the criminal statutes. The Court will address these arguments in the order presented by the Defendants.

### A. Standard on Motion to Dismiss Indictment

Rule 7(c) of the Federal Rules of Criminal Procedure requires a "plain, concise, and definite written statement of the essential facts constituting the offense charged." These requirements are essentially the same as those of the Sixth Amendment, which mandates that an indictment must: "(1) enumerate each *prima facie* element of the charged offense; (2) fairly inform the defendant of the charges filed against him; and (3) provide the defendant with a double jeopardy defense against future prosecutions." *United States v. Gaytan*, 74 F.3d 545, 551 (5th Cir. 1996). The law "does not compel a ritual of words" when determining if an indictment is sufficient. *United States v. Wilson*, 884 F.2d 174, 179 (5th Cir. 1989). An indictment setting forth the offense in the words of the statute itself is generally sufficient, provided that the statue sets forth the essential elements of the offense. *See United States v. Gordon*, 780 F.2d 1165, 1169 (5th Cir. 1986). This is because the indictment's most basic purpose is to fairly inform the defendant of the charge against him. *Id.* Indeed, the "test for validity is not whether the indictment could have been framed in a more satisfactory manner, but whether it conforms to minimal constitutional standards." *Id.* The Government it is not required to prove its case in the indictment, but simply to set forth the elements of the offense, fairly inform defendants of the charges, and ensure no risk of future prosecution for the same offense. *United States v. Cavalier*, 17 F.3d 90, 92 (5th Cir. 1994). Finally, on a motion to dismiss an indictment, the Court must

3

take the indictment's allegations as true. *See United States v. Kay*, 359 F.3d 738, 742 (5th Cir. 2004) (quoting *United States v. Hogue*, 132 F.3d 1087, 1089 (5th Cir. 1998)).

As a global matter, many of the Defendants' arguments for dismissal are better suited for a motion for acquittal based on the weight of the evidence presented at trial and not a motion to dismiss the Indictment. For example, Defendants downplay some of the allegations as "almost trifling mismanagement ... and a similarly small measure of self-dealing" or "no different from such time honored traditions as voting dead people, [or] stuffing ballot boxes." Defendants may make those arguments to the jury, but at this stage in the case the Court must accept the factual allegations of the Indictment as true. Dismissal based on Defendants' "spin" on the allegations is unwarranted at this time.

**B.     Count 19: Wire Fraud**

Count 19 charges both Defendants with wire fraud in connection with their operation of a post-Katrina charitable foundation. After Hurricane Katrina, donors from other horse racing entities nationwide donated approximately $788,000 to the HBPA to assist HBPA members with obtaining shelter and necessities. Those funds were under the control of a charitable organization established by the HBPA for the purpose, which in turn was under the control of Defendants. According to the Indictment, false representations were made to the donors that "the funds donated would be properly distributed after review by a screening committee composed of specific persons," when in fact Defendants "distributed the funds in their sole discretion without review and approval by the screening committee." In fact, Defendants disbursed some of the funds to themselves or their associates, for purposes other than hurricane relief, such as installing a sound system in Alfortish's home or a cash payment to Romero, who had no Katrina-related losses. The scheme is alleged to have lasted from September, 2005, to

4

August, 2009, when Romero lied to a member of the charitable foundation board concerning use of the donated funds to pay for a college scholarship. The requisite wire communication in furtherance of the scheme is a January 2008 email sent by Alfortish from Louisiana to Kentucky "containing a document entitled Urgent Message from President Alfortish HBPA."

"The mail and wire fraud statutes ... provide that 'whoever, having devised or intending to devise any scheme or artifice to defraud, *or* for obtaining money or property by means of false or fraudulent pretenses, representations or promises,' uses the mail or wires is guilty of mail or wire fraud." *United States v. Hoeffner*, 626 F.3d 857, 863 (5th Cir. 2010) (citing 18 U.S.C. § 1341, 1343). "To prove wire fraud under 18 U.S.C. § 1343, the government must prove: (1) a scheme to defraud and (2) the use of, or causing the use of, wire communications in furtherance of the scheme." *United States v. Dowl*, 619 F.3d 494, 499 (5th Cir. 2010) (quotation omitted). Defendants dispute the sufficiency of the Indictment regarding both the scheme to defraud and the use of the wires.

### 1. Scheme to Defraud

First, Defendants contend that if there was a scheme to defraud, it did not employ any false material misrepresentations. They argue that the alleged false representations "appear no different from the customary assurances that parties to contracts and undertakings make at the outset of a relationship but that over time may not always be exactly or diligently adhered to" and that the Government does not allege that the "representations" were knowingly false and made with intent to deceive and mislead. At most, Defendants argue, the conduct alleged constitutes a breach of contract between the HBPA and the donors. Defendants also note that the indictment alleges that "representations were made," and not that Defendants themselves made the misrepresentations, and thus is insufficient to allege a scheme to defraud. The Government

5

responds that the Indictment sufficiently identifies the nature of the scheme and the false material misrepresentations and adequately sets forth the intent to deceive, and any arguments that the conduct was innocent should be raised at trial.

The Indictment adequately alleges a scheme to defraud using false material misrepresentations regarding how the Katrina donations would be administered. Defendants may argue to the jury that the conduct was a mere breach of contract, but their characterization of the allegations is not grounds to dismiss the Indictment, which adequately sets forth the elements of the statute and notifies Defendants of the charges against them.

**2.     Use of the Wires**

Second, Defendants argue that the Government has not sufficiently alleged the requisite wire communication in furtherance of the scheme. Use of the wires must be in furtherance of the scheme to defraud, and the "scheme to defraud is complete when '[t]he persons intended to receive the money ha[ve] received it irrevocably.'" *United States v. Arledge*, 553 F.3d 881, 891-92 (5th Cir. 2008) (quoting *United States v. Maze*, 414 U.S. 395, 400 (1974)). But a mail or wire communication sent "after the completion of a scheme to defraud may still be 'for the purpose of executing' the scheme if the mailing was intended to conceal the fraud from the victim and 'therefore make the apprehension of the defendants less likely than if no mailings had taken place.'" *United States v. Curry*, 681 F.2d 406, 411-12 (5th Cir. 1982) (quoting *United States v. Maze*, 414 U.S. 395 (1974)).

Defendants rely on a line of cases reversing convictions because the mail or wire communications were not in furtherance of the scheme to defraud. In *United States v. Evans*, the defendant was a parole officer who accepted bribes in exchange for concealing a parolee's violations. 148 F.3d 477, 478-79 (5th Cir. 1998). As part of the scheme to defraud, the officer

6

submitted travel vouchers for nonexistent parole inspections to create the appearance of doing her duties, and those vouchers were subsequently mailed by someone else to a custodian of records. *Id.* at 479. The Fifth Circuit reversed the defendant's conviction on counts of mail fraud because the scheme to defraud was completed when the defendant's supervisor approved the fraudulent vouchers without discovering the deception. Although the vouchers were later mailed somewhere else by someone else, "[t]he mailing was entirely incidental to the scheme," and the scheme would have continued if the approved vouchers had simply been thrown away instead of mailed away. *See id.* at 483; *see also Henderson v. United States*, 425 F.2d 134, 140-43 (5th Cir. 1970) (reversing mail fraud convictions because the alleged mailings were sent ten months after the fraudulent transaction had been completed and the mailings were "an isolated incident" that did not further the scheme).

The Defendants argue that the January 2008 email could not have been an essential part of scheme because the Katrina funds had already been solicited, donated, and distributed and the alleged fraud was long since completed. They argue that, as in *Evans* and *Henderson*, the 2008 email was sent after the alleged fraud had been accomplished and as a matter of law could not have furthered the scheme. Without a wire communication, they argue that Count 19 should be dismissed.

The Government responds that the scheme to defraud lasted from September 2005 to August 2009, and that the January 2008 email falls within that time frame. Furthermore, although the email was sent after the funds had been transferred, the Government argues that the email was sent directly by Alfortish in furtherance of the scheme because it was specifically intended to assuage and lull the donors regarding the allegations of fraud and to evade detection, unlike the tangential and immaterial communications in *Evans* and *Henderson*.

7

The Indictment sufficiently tracks the elements of the statute and notifies Defendants of the nature of the charge and the wire transmission at issue. The Defendants may argue at trial that the January 2008 email was not sent in furtherance of the fraud and move for acquittal if the evidence is insufficient, but that argument does not warrant dismissal of the Indictment at this stage when the Court must take the allegations of the Indictment as true. The motion to dismiss is denied as to Count 19.

**C.     Counts 2-18: 2008 Election Allegations**

    **1.     Counts 2-5: Wire Fraud**

Counts 2-5 relate to the alleged rigging of the 2008 election of the HBPA Board of Directors. The Indictment alleges that Defendants devised a scheme to rig the 2008 election to ensure that Alfortish would be reelected, and that certain dissident board members would be voted out in favor of other candidates who would not question Alfortish and Romero's ongoing criminal activities. The goal of the scheme was to continue to obtain money and property from the HBPA in the form of "salary, fringe benefits, financial and other rewards as officers and employees." The Government alleges that Defendants falsified ballots from eligible voters who were unlikely to vote in the election and used the voters' social security numbers to make the ballots appear legitimate. Then, the Defendants traveled by plane outside of Louisiana to mail the ballots with non-Louisiana postmarks. Interstate wires were allegedly used to make bank account transfers to pay for the flights.

    There are "at least two means of committing mail or wire fraud: (1) a scheme or artifice to deprive another of his intangible right to honest services; and (2) a scheme or artifice to obtain money or property." *United States v. Hoeffner*, 626 F.3d 857, 863 (5th Cir. 2010) (citing 18 U.S.C. § 1341, 1343). The Indictment alleges only the latter type of money or property fraud. It

8

does not allege an honest services theory of wire fraud, which the Supreme Court recently limited to traditional bribery and kickback cases. *See Skilling v. United States*, 130 S. Ct. 2896 (2010).

In *United States v. Ratcliff*, the defendant was a parish president charged with mail fraud solely on a theory of "money or property" fraud, and not honest services fraud. 488 F.3d 639, 643 (5th Cir. 2007). The government's theory was that:

> ... Ratcliff devised a scheme (1) to conceal campaign finance violations from the Board of Ethics, which would (2) deceive the voting public about the campaign contributions he received, which would (3) secure his reelection to office, which would (4) cause [the parish] to pay him the salary and other financial benefits budgeted for the parish president.

*Id.* at 645. The Fifth Circuit held that this was not criminal mail fraud because, although the defendant would benefit by obtaining the salary that came with the office, the parish would not be defrauded or deprived of any money or property that it would not have otherwise paid to the officeholder; rather, "the financial benefits budgeted for the parish president go to the winning candidate regardless of who that person is*." Id.* at 645; *see also United States v. Turner*, 465 F.3d 667 (6th Cir. 2006) (finding no deprivation of property "because the relevant salary would be paid to someone regardless of the fraud. In such a case, the citizens have simply lost the intangible right to elect the official who will receive the salary."). The defendant's campaign finance misrepresentations "simply did not implicate the parish's property rights." *Id.* at 645-46. Thus, the scheme in *Ratcliff* was not "money or property fraud" cognizable under the mail fraud statute.

Defendants argue that the Indictment in this case also fails to allege "a scheme to defraud

9

someone of something that is properly charged and cognizable under the wire fraud statute."[1] Relying on *Ratcliff*, they argue that the only money or property implicated by the scheme is the benefits that would have gone to anyone elected to the Board in 2008, whether or not it was Alfortish, or salary that would have gone to anyone employed in Alfortish or Romero's positions as HBPA employees. Put another way, Defendants contend that the only thing obtained by the alleged scheme was control of the HBPA, not any direct property or money, and therefore "there is no nexus between the alleged election fraud and the payment of any salaries or benefits."[2] Defendants also argue that in fact, the only target of the scheme was deprivation of the HBPA's right to an honest election, or to Defendants' honest services in supervising the election, and that post-*Skilling*, honest services fraud without bribery or kickbacks (which are not alleged) is not cognizable as wire fraud.

The Government responds that the Indictment adequately sets forth a scheme intended to conceal prior theft and to ensure ongoing payment of money and property in the form of "salary, fringe benefits, financial and other awards as officers and employees of the HBPA." The Indictment lists a number of benefits the Defendants obtained both before and after 2008 as a result of their involvement with the HBPA, such as "Cadillac" insurance plans, expensive handbags, and reimbursement for money paid to settle sexual harassment lawsuits. The Indictment also alleges that the scheme ensured continued siphoning of HBPA funds for

---

[1] Defendants concede that "the indictment indeed alleges a scheme, employing false representations."

[2] Defendants also argue that in fact, the only target of the scheme was deprivation of the HBPA's right to an honest election, or to Defendants' honest services in supervising the election, and that post-*Skilling*, honest services fraud without bribery or kickbacks is not cognizable as wire fraud. The Government has not charged Defendants with honest services fraud, and *Skilling* is beside the point.

10

Defendants' personal benefit by reelecting Alfortish and electing new directors who would not question Defendants' ongoing criminal activity.

The Indictment sufficiently alleges a scheme to defraud the HBPA and its members of money and property. Taking the allegations as true, the Defendants influenced the 2008 Board of Directors election to reelect Alfortish and to elect new directors who would not scrutinize or interfere with Alfortish and Romero's activities. Those activities included spending HBPA resources for their own personal benefit, above and beyond any salaries they received as employees of the HBPA that might have been inevitably owed to others. This case is different from *Ratcliff*, where the parish would have paid the same salary regardless of the effect of the election fraud; here, according to the Indictment, without rigging the 2008 election, the Defendants would not have been able to take as much from the HBPA. The fraud implicates money or property of the HBPA. Accordingly, the motion to dismiss is denied as to Counts 2-5.

**2.    Counts 6-18 (Identification Document Fraud)**

Counts 6-18 also relate to the 2008 election. These counts charge violations of 18 U.S.C. § 1028(a)(7), fraud in connection with identification documents:

> (a) Whoever, in a circumstance described in subsection (c) of this section--
> ...
>> (7) knowingly transfers, possesses, or uses, without lawful authority, a means of identification of another person with the intent to commit, or to aid or abet, or in connection with, any unlawful activity that constitutes a violation of Federal law....
>
> ...
> (c) The circumstance referred to in subsection (a) of this section is that–
> ...
>> (3) either-
>>> (A) the production, transfer, possession, or use prohibited by this section is in or affects interstate or foreign commerce, including the transfer of a document by electronic means; or

11

>> (B) the means of identification, identification document ... is transported in the mail in the course of the production, transfer, possession, or use prohibited by this section.

18 U.S.C. § 1028.

Defendants argue that the statute requires "the intent to commit ... any unlawful activity that constitutes a violation of federal law." Because they have argued that Counts 2-5 do not allege criminal conduct cognizable under the wire fraud statute, there was no "intent to commit ... unlawful activity that constitutes a violation of federal law" and that these derivative counts must also be dismissed. However, the Court has already concluded that Counts 2-5 sufficiently allege wire fraud. Accordingly, Counts 6-18 do not fall with Counts 2-5 and the motion is denied as to those counts.[3]

## D.     Counts 20-28: Health Care Fraud: Medical Benefits Trust Fund Allegations

Counts 20-28 allege health care fraud in connection with a Medical Benefits Trust established by Louisiana law and operated by the HBPA. Pursuant to Louisiana law, 4% of horse racing purses are allocated "to the [HBPA] for the use and benefit of such permittees, their employees, and others as medical and hospital benefits with an amount not to exceed thirty percent aforesaid of the commissions and amounts received by the [HBPA] to be used for

---

[3] In *United States v. Sutcliffe*, the Ninth Circuit held that the § 1028(a)(7) element requiring "the intent to commit, or to aid or abet, or in connection with, any unlawful activity that constitutes a violation of Federal law," requires only criminal intent to violate another federal law, and not actual completion of the underlying crime. *See* 505 F.3d 944, 960 (9th Cir. 2007). The Government urges that *Sutcliffe* defeats the Defendants' argument because Counts 6-18 do not depend on actual commission of an underlying crime. However, Defendants argue that the allegations in Count 2-5, taken as true, fail to allege criminal conduct at all, and therefore intent to commit the acts in 2-5 cannot satisfy the intent requirement of § 1028(a)(7). The motion is denied as to Counts 6-18 not because of the reasoning in *Sutcliffe*, but because Counts 2-5 sufficiently allege wire fraud, and the intent to commit the conduct in those counts satisfies the intent requirement of Counts 6-18.

administrative expenses and other costs necessary to provide the benefits." La. Rev. Stat. § 4:183(A)(4)(b). The parties and the Court refer to this 4% of horse racing purses as "the Medical Benefits Trust," and the portion not to exceed 30% of the Medical Benefits Trust as the "Administrative Account."

The Indictment charges that the Defendants caused the statutory maximum thirty percent of funds directed to the Medical Benefit Trust to be deposited into an administrative account, when less than thirty percent was in fact necessary for administrative expenses and costs. Then, Defendants used funds from that administrative account for disallowed purposes. Defendants allegedly spent administrative account funds on personal expenses, including costs associated with rigging the 2008 election, personal attire, attending a public official's inauguration, travel to the Cayman Islands, spa treatments, and bonuses paid to Defendant Romero. Further, the Indictment alleges that Defendants siphoned Medical Benefits Trust administrative account funds to the HBPA, to conceal the HBPA's financial position and Defendants' mismanagement of the HBPA. The Indictment alleges that in 2010 the HBPA owed $823,285 to the Trust administrative account, which the HBPA would not pay back and which interfered with delivery of health benefits to beneficiaries of the Trust.

Congress has enacted a specific statute criminalizing certain fraud relating to health care benefit programs:

> Whoever knowingly and willfully executes, or attempts to execute, a scheme or artifice–
> > (1) to defraud any health care benefit program; or
> > (2) to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program,
> >
> > in connection with the delivery of or payment for health care benefits, items, or services [shall be punished].

18 U.S.C. § 1347 (2006) (amended in 2010). Each of Counts 20-28 alleges a specific fraudulently obtained payment made out of the Medical Benefit Trust administrative account.

### 1. Allegation of false representations

First, Defendants argue that there are no allegations that they made any false representations to obtain money or property, rather than making "a simple misappropriation or misapplication." They argue that the HBPA had routinely made payments out of a single account and then later reallocated the payment to the proper account, and that the practice predated Alfortish's term as President. Thus, they contend that any money paid by the Medical Benefits Trust on behalf of the HBPA was properly noted on the books as a debt owed by the HBPA to the Trust, which the HBPA was able to pay. Defendants argue that the Government is exalting "the form of bookkeeping over its substance." The Government responds that the Indictment sufficiently alleges the element of false representations in the form of communications and financial reports to HBPA board members or trustees of the Medical Benefits Trust which omitted the fact that funds had been transferred away from the Medical Benefits Trust to the HBPA.

The Indictment tracks the language of the health care fraud statute and adequately sets out the elements. Defendants may argue at trial that the bookkeeping was innocuous rather than fraudulent.

### 2. Allegations of connection to delivery of healthcare benefits

Second, Defendants argue that the Indictment fails to sufficiently allege that the scheme was done "in connection with the delivery of or payment for healthcare benefits, items, or services," as required by the statute. They contend that it is not enough simply to fraudulently

14

take money from a health care entity, but the action must be "in connection with ... health care benefits." Defendants cite *United States v. Jones*, in which the Third Circuit reversed a conviction because the government failed to show that requisite connection. 471 F.3d 478 (3rd Cir. 2006). In *Jones,* a health clinic receptionist was tasked with accepting cash payments from patients, recording the payments, and depositing them at the bank. *Id.* at 479. The defendant accepted and recorded the payments, but deposited less than all of the cash receipts and retained some of the money for herself. *Id.* The defendant was convicted of health care fraud but the Third Circuit reversed, holding that there was no evidence of any "type of misrepresentation made in connection with the delivery of, or payment for, health care benefits or services." *See id.* at 482. Rather, the defendant simply stole or embezzled money that happened to have been generated by the provision of health care benefits, and that conduct was already criminalized by a separate statute. *See id.* (citing 18 U.S.C. § 669). It should be noted that *Jones* reversed a conviction after trial by a jury, not a denial of a motion to dismiss.

The Government responds that it will prove at trial that, as a result of Defendants' siphoning Trust administrative funds into the HBPA and using them for their personal benefit, the Trust had to reduce and restrict benefits and delay payments to beneficiaries. Thus, the alleged fraud was not simple theft or embezzlement, but had a concrete impact on the delivery of health benefits.

Again, Defendants' arguments regarding the connection between the alleged scheme and the delivery of health care benefits are best saved for argument to the jury and a motion for acquittal. The Government has adequately alleged the elements of the statute and the nature of the fraudulent misrepresentations and the nexus between the defrauded funds and the delivery of health care benefits. That is all that is required of an Indictment. The motion is denied as to

15

Counts 20-28.

**E.      Count 29: Witness Tampering**

Count 29 alleges that Romero "urged Person A to 'stick together' with her, ALFORTISH and others, and not to cooperate with the law enforcement authorities investigating their conduct" and that Alfortish gave Person A a legal opinion that was in Alfortish's own interest, and not necessarily in Person A's interest, despite knowing that Person A was already represented by a different attorney.  The Indictment charges that those actions constitute witness tampering.  Under federal law,

> (b) Whoever knowingly uses intimidation, threatens, or corruptly persuades
> another person, or attempts to do so, engages in misleading conduct toward
> another person, with intent to–
> ...
>> (3) hinder, delay, or prevent the communication to a law enforcement
>> officer or judge of the United States of information relating to the
>> commission or possible commission of a Federal offense...
>
> shall be [punished].

18 U.S.C. § 1512(b)(3).

In *United States v. Doss*, the Ninth Circuit reversed a witness tampering conviction.  630 F.3d 1181 (9th Cir. 2011).  The defendant was charged with witness tampering in connection with urging his wife not to testify against him.  The Ninth Circuit reversed the conviction because the evidence at trial "established only that [defendant] appealed to his wife to exercise her marital privilege not to testify against him" which did not rise to the level of "corrupt" persuasion rather than permissible innocent persuasion.  *See id.* at 1189-90.  Although the Ninth Circuit reversed the denial of a motion to acquit, it affirmed denial of a motion to dismiss the same witness tampering charge.  The court held that "the indictment adequately tracked the statutory language, set forth the necessary elements of the offense, and included sufficient facts

to inform [defendant] of the specific offense with which he was charged and to enable him to plead acquittal or prior conviction of the same offense. The district court was required to accept the government's allegations as true." *Id.* at 1189 n.5.

Defendants first argue that, because the rest of the Indictment fails to charge any viable crimes, there could be no "information relating to the commission or possible commission of a Federal offense," and thus no witness tampering. That argument fails because the motion is denied as to all the other counts.[4]

Second, Defendants argue that the factual allegations do not support a witness tampering charge. Citing *Doss*, they contend that the allegations are "at most, innocuous efforts to persuade a witness to do what the law allows," such as declining to talk to law enforcement. However, *Doss* reversed a conviction based on a complete factual record developed at trial and in fact affirmed the pre-trial denial of a motion to dismiss the indictment. Here, the Indictment tracks the language of the statute and puts Defendants on notice of the charges against them. The Defendants may revisit the issue, if necessary, on a motion for an acquittal.

## F.     Count 1: Conspiracy

Lastly, Count 1 of the Indictment charges the Defendants with conspiracy to commit mail fraud, wire fraud, and identification document fraud (in connection with the falsified 2008 election ballots), and health care fraud (in connection with the alleged misuse of Medical Benefit Trust funds). The alleged conspiracy does not involve the allegations of witness tampering or fraud related to the charitable foundation.

Defendants argue that if "there is no possible substantive offense prosecutable under any

---

[4] The statute also encompasses tampering regarding the "*possible* commission of a Federal offense." 18 U.S.C. § 1512(b)(3) (emphasis added).

of those theories," based on their arguments to dismiss each of those counts, then the conspiracy charge to commit those offenses must also be dismissed. For the foregoing reasons, the Court has denied the motion to dismiss with respect to all the other counts in the Indictment. The Indictment sufficiently alleges the offenses charged and it sufficiently alleges conspiracy to commit those offenses.

## III.    Conclusion

Accordingly, for the foregoing reasons, Defendants' motion to dismiss the indictment (Rec. Doc. 35) is DENIED.

New Orleans, Louisiana, this 8th day of June, 2011.

_____
UNITED STATES DISTRICT JUDGE